Filed 12/11/23  In re J.M. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re J.M., a Person Coming Under the Juvenile Court Law. | D082502 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>P.M.,<br><br>    Defendant and Appellant. | (Super. Ct. No. J521176) |

APPEAL from an order of the Superior Court of San Diego County, Marissa A. Bejarano, Judge.  Affirmed.

Suzanne M. Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent.

This is the second appeal by P.M. (Mother) involving her son, J.M.  In a prior appeal, we affirmed an order placing J.M. in Arizona with the maternal

aunt (Aunt) pursuant to the relative placement preference of Welfare and Institutions Code[1] section 361.3. (*In re J.M.* (Nov. 22, 2023, D082385) [nonpub. opn.] (*J.M. I*).) While that appeal was pending, Mother filed a petition under section 388 for modification of the placement order. Specifically, Mother requested that the court modify its order to maintain J.M.'s placement in San Diego with the great-uncle and to allow Mother to have structured, unsupervised visits with J.M. at her sober living facility.

In July 2023, the juvenile court denied Mother's section 388 petition. Mother now appeals that denial, contending in this instance that the court abused its discretion in denying her an evidentiary hearing. We conclude that the court properly exercised its discretion in determining Mother failed to make a prima facie showing that (1) there were substantially changed circumstances, or (2) her requested modifications were in J.M.'s best interests. Accordingly, we affirm the juvenile court's order.

FACTUAL AND PROCEDURAL BACKGROUND

I.    *Prior Proceeding*[2]

In January 2023,[3] bystanders physically detained Mother after they saw her hit her then two-year-old-son J.M. in the face multiple times. A bystander took J.M. from Mother while other individuals called police. Mother was intoxicated and attempting to leave when she encountered another bystander, whom she punched in the face and knocked to the ground. A doctor examined J.M., finding a swollen upper lip and a reddened cheek

---

[1]    All further statutory references are to the Welfare and Institutions Code.

[2]    We take the factual background of the prior proceeding from our prior opinion. (*J.M. I*, *supra*, D082385.)..

[3]    All undesignated date references are to 2023.

with linear marks. The doctor opined that the injuries were diagnostic of physical abuse.

The San Diego County Health and Human Services Agency (the Agency) had previously opened a voluntary case for Mother because she used heroin, methamphetamine, and marijuana while pregnant with J.M. She took illicit drugs during her first trimester, but ceased use after learning of her pregnancy. Mother suffered from schizophrenia and bipolar disorder. She stopped taking psychotropic medication a few years earlier and did not participate in mental health services.

In early February, the Agency filed a petition on J.M.'s behalf because of Mother's untreated mental health issues. Mother agreed to allow the great-uncle to care for J.M. as part of a safety plan and the Agency placed J.M. with him. Between February and April, Mother experienced multiple drug use relapses interspersed with negative tests for illegal substances. She reported experiencing auditory and visual hallucinations. In or around April, Mother moved into an inpatient treatment program.

In April, the Agency learned that Arizona authorities approved J.M. to live with Aunt in Arizona. The Agency asked the juvenile court for discretion to place J.M. there. Aunt was prepared for J.M. to live with her and visited him while he resided in San Diego with the great-uncle.

In its June report, the Agency noted Aunt remained in regular contact with Mother. Aunt and Mother discussed allowing the maternal family to care for J.M. so he could enjoy stability while Mother worked on her protective issues. If the court placed J.M. in her care, Aunt would both allow Mother to visit J.M. in Arizona and facilitate frequent Facetime visits. Aunt also expressed willingness to travel to San Diego monthly so J.M. might visit with Mother.

3

Mother initially wanted J.M. placed with Aunt, although she implied it would be easier to reunify with J.M. if he remained in San Diego. However, if the court bypassed her reunification services Mother wanted J.M. placed with Aunt. Mother felt the great-uncle was tired and needed a break from caring for J.M., especially because he also cared for her oldest daughter.

Regarding an interim placement, the Agency assessed the section 361.3 factors concluding they weighed in favor of J.M.'s placement with Aunt. She was aware of J.M.'s needs, prepared her home for him, and researched schools and activities on his behalf. The maternal grandmother and the great-uncle also wanted J.M. to be placed with Aunt. Although Mother initially agreed with this approach, and did throughout most of the case, she at times implied she wanted J.M. to remain in San Diego for reunification purposes.

The Agency report observed that the great-uncle expressed a willingness to provide temporary care of J.M. The maternal family believed the great-uncle grew tired of caring for Mother's children. The great-uncle hesitated to state these feelings because he did not want J.M. in foster care. Moreover, the great-uncle and Mother had a strained relationship. The Agency opined this could adversely affect reunification, which required communication between the caregiver and the parent.

At the contested dispositional hearing in June, the juvenile court found J.M.'s best interests favored placement with Aunt. The court ordered the Agency to hold a child and family team meeting to create a visitation plan for Mother. J.M. would remain in San Diego until the plan got deployed. Mother appealed. (*J.M. I*, *supra*, D082385.)

In our November opinion resolving that appeal, we explained that the record supported the juvenile court's decision to place J.M. with Aunt. We

4

concluded that "[t]he court reasonably determined it was in J.M.'s best interests to live with Aunt" and affirmed the court's findings and orders. (*J.M. I, supra*, D082385.)

## II.    *Current Proceeding*

### A.    *Child and Family Team Meeting*

Mother, the great-uncle, Aunt, the social worker, a protective services supervisor for the Agency and J.M.'s attorney participated in a child and family team meeting in July.

The great-uncle reported J.M. improved in many areas while detained in his care. He expressed concern about J.M.'s move to Arizona without daycare and services in place. He did not want Aunt to feel burdened but noted placement with her was in J.M.'s best interests long term. Further, the great-uncle noted he wanted to help transition J.M. to Aunt's care and was open to visiting J.M. in Arizona.

Mother self-reported involvement in parenting classes, psychiatry/medication management, and child abuse classes. She opined J.M. had excelled in out-of-home care, noted the family loved and supported one another, and reported that she learned certain skills in her services. Mother was concerned she lacked income and a bank card.

Aunt wanted to know J.M.'s social worker in Arizona and the details about flights for visits. She was concerned about daycare support and other resources. She noted that the family may be available in emergency situations and may be able to help Mother by putting incidental costs on a bank card. Aunt was also willing to facilitate video calls between Mother and J.M. during the week and in between visits.

The protective services supervisor for the Agency noted that J.M. may need to be placed with Aunt before Arizona assigned him a social worker.

5

The Agency would submit a request to its travel desk for visits requiring airplane travel. Although there could be issues with daycare funding, the supervisor intended to explore options for support.

The social worker commented on Mother's familial support and general engagement in services. She noted she may be able to assist with Mother's travel and getting services for J.M. in Arizona. She was concerned Arizona had not offered services to support J.M.'s placement there. She noted the Agency would supply plane tickets for J.M. and Aunt, and that the Agency would submit requests to provide Mother with plane and hotel accommodations for her visits in Arizona. She noted Mother would need a bank card on file to cover incidental costs.

Upon his placement in Arizona, J.M. was to visit Mother in San Diego the third weekend of each month. Mother was open to visiting J.M. in Arizona on the first and last weekend of each month. Additional follow up included exploring daycare services in Arizona, finding other funding or babysitting options, exploring services for J.M. that were separate from those provided by child welfare agencies, communicating with the child welfare agency in Arizona, and ensuring a visitation and transition plan was set before J.M.'s move.

B.  *Mother's Section 388 Petition*

In July, Mother filed a petition under section 388 asking the court to change its prior order from placing J.M. with Aunt to maintaining his placement with the great-uncle. She also asked the court to order a minimum of four structured, unsupervised visits at her sober living facility per week spanning three hours.

Mother alleged that the changed circumstances included that the Agency's visitation plan for Mother upon J.M.'s move to Arizona was not

6

"practical." The social worker and Aunt "did not share the same understanding of the oversight in" Arizona, when the move would take place, "the services that would be provided, and childcare." Mother further alleged she reached "over 90 days of sobriety" and last drank alcohol in April.

Mother asserted that it was in J.M.'s best interests because he was bonded to Mother, he expressed sadness when separating from her at a recent visit, and her requested orders would facilitate reunification. She attached to her petition: (1) the child and family team meeting notes; (2) the minute order from the contested disposition hearing in the prior proceeding; (3) the social worker's June addendum report.

C.    *Hearing on Mother's Petition*

Mother asked the court to set her section 388 petition for an evidentiary hearing. Regarding her request for structured, unsupervised visits, she cited the Agency's report attached to her petition. It showed that Mother maintained 90 days of sobriety. She also argued that her visits were consistent and occurred without issue.

Mother provided an offer of proof from her investigator. If called to testify, her investigator would state that Mother began visits with J.M. at the beginning of May, that J.M. often appeared quiet and upset at the end of visits and became excited before visits, that Mother acted appropriately during visits, and that J.M. expressed a desire to spend more time with Mother at a recent visit. Per the investigator's offer of proof, J.M. held Mother's hands and repeatedly said, "I don't want to[ ]" when the visit was ending and upon driving away from the visit.

Mother argued that some logistics for J.M.'s transition to Arizona, and Mother's visits with him there, remained unresolved after the child and family team meeting. Her investigator would testify that the Agency and

7

Aunt did not share an understanding about the available funding, transition date, and the individuals allowed to be around J.M. once placed in Aunt's care. The investigator would also testify that concerns were expressed about the implementation of timely services for J.M. in Arizona, logistics of Mother's travel to and from Arizona, and that the social worker and Aunt did, at times, exhibit frustration toward each other.

J.M.'s counsel joined in Mother's request for an evidentiary hearing. She also agreed with Mother's request for structured, unsupervised visits.

The Agency argued that Mother's request to change J.M.'s placement constituted an attempt to relitigate the hearing at issue on appeal in the prior proceeding. It noted that a visitation plan was reached with the Agency, Mother, Aunt, and the great-uncle. It laid out the visitation plan, including logistics, issues related to cost, and Mother's ability to expand her visitation on the record. It would address any concerns that arose upon execution of the plan. In opposing Mother's request for structured unsupervised visits, the Agency referred to its reports.

D.    *The Juvenile Court's Findings and Orders*

"After reviewing the documents that have been submitted and the entire factual and procedural history," the juvenile court found that Mother had "not met her burden of proof that there has been either a change of circumstances or that it would be in [J.M.'s] best interest to change the Court's order." Although "certain details have not been worked out regarding services that are to be provided to [J.M.]," the court found that "details of a visitation schedule has been established" for Mother and that "the details regarding those visits have been arranged." It ordered Mother's visits to last at least three hours so that Mother would receive "more visitation than she currently is receiving."

8

Regarding best interests, the court noted it "conducted an analysis specifically pursuant to section 361.3" in the prior proceeding and "determine[d] that it was in [J.M.'s] best interest to be placed with [Aunt] in Arizona."  It also found Mother had established "changing circumstances" instead of changed regarding her request for structured unsupervised visits. As Mother had a lengthy substance use history and relapsed after a five-year period of sobriety, the court wanted to see Mother demonstrate "additional stability and sobriety."  It also noted "the protective issue is not just related to [Mother's] alcohol use but also [Mother's] mental health and the child abuse concerns."

After concluding that Mother "failed to meet her prima facie burden of proof," the juvenile court denied her section 388 petition.

DISCUSSION

Mother appeals from the juvenile court's summary denial of her section 388 petition.

A.    *Legal Principles*

Section 388 allows a parent to petition the juvenile court to modify a placement order due to changed circumstances or new evidence.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).)  To prevail on a section 388 petition, the petitioning parent must show by a preponderance of the evidence that (1) new evidence or a changed circumstance warrants alteration of the juvenile court's prior placement order, and (2) the proposed change is in the best interest of the child.  (*Ibid.*)  " 'Not every change in circumstance can justify modification of a prior order.' "  (*In re N.F.* (2021) 68 Cal.App.5th 112, 120.)  To be sufficient, the change must be material, relevant, and substantial.  (*Id.* at pp. 120, 121, fn. 3.)

Before an evidentiary hearing is required, the petitioning parent must first make a prima facie showing that these two elements are supported by "probable cause." (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1157; *In re Marilyn H.* (1993) 5 Cal.4th 295, 310 (*Marilyn H.*).) "While the petition must be liberally construed in favor of its sufficiency [citation], the allegations must nonetheless describe specifically how the petition will advance the child's best interests." (*In re G.B.*, at p. 1157.) If the allegations would fail to sustain a favorable decision even if they were accepted as true, the petition may be summarily denied without an evidentiary hearing. (*Ibid.*)

"In determining whether the petition makes the required showing, the court may consider the entire factual and procedural history of the case." (*In re K.L.* (2016) 248 Cal.App.4th 52, 62.) " 'Not every change in circumstance can justify modification of a prior order.' " (*In re N.F.* (2021) 68 Cal.App.5th 112, 120.) The petition "must show *changed*, not changing, circumstances" (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615 (*Mickel O.*)), and the changed circumstances "must be substantial" (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223 (*Ernesto R.*)). That is, there must be a showing that "the problem that initially brought the child within the dependency system [has been] removed or ameliorated." (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.)

A modification petition is addressed to the sound discretion of the juvenile court and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 318.) A dependency court abuses its discretion when its decision exceeds the bounds of reason. (*Id.* at pp. 318–319.) Thus, unless it is clearly established that the court made an " ' "arbitrary, capricious, or patently absurd determination," ' " the trial court's ruling should not be disturbed on appeal. (*Id.* at p. 318.)

B.    *Changed Circumstances*

Mother first argues that the juvenile court erred in denying Mother's request for an evidentiary hearing because she made a prima facie showing of changed circumstances.  We disagree.

Mother argues that "she remained in her sober living facility and continued to make progress to address her substance abuse and mental health issues."  Although we commend Mother for her efforts in starting down the path of recovery, we nevertheless conclude that the trial court did not abuse its discretion by finding "changing" rather than "changed" circumstances.  In cases involving a history of substance abuse problems, courts have consistently declined to recognize *substantially changed* circumstances based on a relatively brief period of sobriety or engagement in a treatment program.  (*Ernesto R.*, *supra*, 230 Cal.App.4th at p. 223 [despite her completion of a drug treatment program, mother's recent sobriety merely reflected *changing* circumstances given her history of relapses]; *In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1081 [concluding "three months old" efforts at sobriety did not demonstrate changed circumstances]; *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423 [concluding seven months of sobriety were insufficient to show changed circumstances given long history of addiction].)

This case is no different.  The juvenile court properly concluded that Mother had a serious history of drug and alcohol abuse.  The court noted that she "began using alcohol at a very young age, at the age of eight, and throughout her life she continued to struggle with substance abuse.  She's been diagnosed with alcohol use disorder, cannabis use, amphetamine use."  Mother "has been able to maintain her sobriety for up to five years, and in the past that she has been able to maintain her sobriety while she's been court-involved or on probation, but then unfortunately she has returned to

11

use." Given Mother's extensive history of drug and alcohol abuse, and her continuing need for therapy and residence in a sober living facility, the juvenile court reasonably concluded that her recovery was still a work in progress, notwithstanding her more than 90 days of sobriety.

Mother also argues that her "continued proactive engagement in services, her improved and strengthened bond with her son and [J.M.'s] continued improvement while in [the great-uncle's] care are material changed circumstances to warrant the granting of an evidentiary hearing." But once again these are "changing" circumstances rather than changed circumstances. Mother did not begin visiting J.M. until May and then, barely a month later, she expressed concern she could not care for him due to her mental health state. The court correctly found that Mother's mental health and child abuse concerns had not been adequately addressed. Although Mother was prescribed psychiatric medication in February, there was no evidence she was compliant in taking it. Additionally, her petition did not address concerns related to her mental health, and she had not demonstrated a period of sobriety or mental stability outside of a structured living facility.

Moreover, Mother's arguments overlook the governing standard of review on appeal. We lack authority to reweigh the evidence or substitute our judgment for that of the juvenile court. (*Stephanie M.*, *supra*, 7 Cal.4th at pp. 318–319.) As discussed above, there is sufficient evidence in the record supporting the juvenile court's finding that circumstances were "changing," not changed. (See *In re J.C.* (2014) 226 Cal.App.4th 503, 530 [substantial evidence standard of review is applicable to the factual components of a juvenile court's determination].) Or stated another way, Mother's evidence failed to demonstrate the recent changes were "substantial . . . when

12

considered in light of all of the circumstances of the case." (*In re N.F.*, *supra*, 68 Cal.App.5th at p. 121, fn. 3.)

In fact, at a hearing in July, Mother's attorney conceded that "[t]here's nothing new here in the [section] 388 [petition], aside from Mother's sobriety date." She further explained that her concerns were "not new," but were "the same" that she "cited at trial" in the prior proceeding regarding "the practicality as to how this plan is going to work." Because the juvenile court did not abuse its discretion by finding no substantial change of circumstances, it acted properly by denying Mother's section 388 petition.

C.    *J.M.'s Best Interests*

The juvenile court also ruled against Mother on the second requirement for relief under section 388 by finding that the proposed modification would not be in J.M.'s best interests. On appeal, Mother argues that because granting her "structured, unsupervised visits at her sober living facility and keeping [J.M.] placed locally with [the great-uncle] might be in [J.M.'s] best interest, the juvenile court should have at least held an evidentiary hearing." We disagree with Mother.

The concept of a child's best interest " 'is an elusive guideline that belies rigid definition.' " (*In re Ethan N.* (2004) 122 Cal.App.4th 55, 66, quoting *Adoption of Michelle T.* (1975) 44 Cal.App.3d 699, 704.) Its purpose is to maximize a child's ability to mature into a stable, well-adjusted adult. (*Jennifer S. v. Superior Court* (2017) 15 Cal.App.5th 1113, 1124.) At the hearing on Mother's petition, the court determined that it had already heard all the evidence at the contested disposition hearing, which was less than a month earlier, and found that it was in J.M.'s best interests to be placed with Aunt in Arizona. The court noted that it had analyzed "which relative it

13

would be in [J.M.'s] best interest of being placed with . . . [and] made the determination it was [Aunt.]."

Mother once again has failed to show that the juvenile court abused its discretion in determining J.M.'s best interests. In addition to all the reasons set forth in our prior opinion (*J.M. I*, *supra*, D082385), additional evidence supports the court's decision, including that the great-uncle viewed J.M.'s placement with Aunt to be in J.M.'s long-term best interests and that he wanted to help transition J.M. to her care. The juvenile court correctly determined there was a plan for Mother to visit J.M. in Arizona with the details arranged, which would provide her with more visitation than she currently received. The court's decision was further supported by Mother's delay in starting child abuse classes and voluntary services.

We conclude that juvenile court did not abuse of discretion in denying Mother an evidentiary hearing on her section 388 petition.

DISPOSITION

The juvenile court's order denying Mother's section 388 petition is affirmed.

HUFFMAN, Acting P.J.

WE CONCUR:


O'ROURKE, J.


IRION, J.

14